# Julie Ann Ainsworth v. Reginald M. Ainsworth

[574 A.2d 772]

No. 87-552

Present: Allen, C.J., Peck, Gibson, Dooley and Morse, JJ.

Opinion Filed March 16, 1990

*Dinah Yessne*, St. Johnsbury, for Plaintiff-Appellant.

*Charles D. Hickey*, St. Johnsbury, for Defendant-Appellee.

Dooley, J. This action for modification of child support calls upon us to interpret Vermont's recently enacted child support guidelines law, 15 V.S.A. §§ 650–663. Specifically at issue is whether expenses for a second family should enter into the determination of child support for the preexisting family. Although the trial court decided that defendant, Reginald Ainsworth, did not have a duty to support his stepson under 15 V.S.A. § 296, it held, pursuant to § 659, that a child support order based on the guidelines sought by plaintiff, Julie Ann Ainsworth, on her behalf and on behalf of the two children of the parties, would be inequitable and ordered him to pay them less than what would be required under the guidelines. Plaintiff appealed and we reverse and remand.

The parties were divorced on April 30, 1986. They stipulated then that defendant was to pay child support in the amount of $35 per week for each of their two children for a total of $70 per week. Mr. Ainsworth remarried on August 15, 1987, and established a new home with his wife and her son at that time. On September 21, 1987, plaintiff filed a motion for modification pursuant to 15 V.S.A. § 660,[1] seeking increased support in an

---

[1] Section 660 provides in part:

(a) On motion of either parent . . . and upon a showing of a real, substantial and unanticipated change of circumstances, the court may annul, vary or modify a child support order, whether or not the order is based upon a stipulation or agreement.

(b) A child support order, including an order in effect prior to adoption of the support guideline, which varies more than 15 percent from the

amount to be determined under the guidelines mandated by the statute that was effective on April 1, 1987. In accordance with § 660(b), she alleged that defendant's support obligations under the original divorce order varied more than fifteen percent from the amount he would be required to pay under the guidelines.

A hearing on the motion was held on November 3, 1987. The parties agreed that since the preexisting order amount was more than 15% lower than an amount calculated under the guidelines, plaintiff had shown a change of circumstances. See 15 V.S.A. § 660(b). Two questions were argued: first, what amount would be imposed under the guidelines; second, whether the court should depart from the guidelines because an order based on them would be inequitable.

As to the first question, the parties agreed that if defendant had a preexisting support obligation to his stepson, the correct guideline figure based on the parties' gross incomes would be $121 per week for both children, and if he did not, the figure would be $141 per week. The trial court ruled that the step-father did not have a preexisting support obligation to his stepson and that the correct figure under the guideline was accordingly $141.

As to the second question, the court held that the guideline figure of $141 per week was greater than was appropriate under the circumstances and would not leave sufficient financial resources for the needs of the defendant. Accordingly, the court held that a departure from the guideline amount was warranted and increased defendant's support obligation to $90 a week, $20 more than under the original order.

As discussed below, the trial court did not give detailed reasons for its conclusion or discuss the factors set forth in 15 V.S.A. § 659 for establishing a support order where it found an order based on the guidelines would be inequitable. The court did state that it was "trying to equitably balance what is reasonable for family number two and what is desirable under the child support legislation for family number one." It went on to

_____

amounts required to be paid under the support guideline, shall be considered a real, substantial and unanticipated change of circumstances.

conclude that "the child support guideline is more than is appropriate in these circumstances, and that it would, in fact, if applied not provide sufficient financial resources for the needs of the defendant."

In order to fully and logically analyze the issues presented by plaintiff's appeal, we will recategorize the issues from those used by the trial court into three questions: (1) whether the trial court may deviate from child support amounts calculated under the guidelines when defendant is supporting children in a second family; (2) if the answer to the first question is yes, whether the power to deviate applies if the children in the second family are stepchildren and not natural children; and (3) if the answer to the first two questions is yes, whether the actual order in this case was within the discretion of the trial court. Before reaching these questions, it is helpful to provide some background on the purposes and operation of the child support guidelines.

■ There are three main purposes behind the child support guidelines. The first is set forth in the legislative statement of purpose:

> The legislature . . . finds and declares as public policy that parents have the responsibility to provide child support and that child support orders should reflect the true costs of raising children and approximate insofar as possible the standard of living the child would have enjoyed had the marriage not been dissolved.

15 V.S.A. § 650. See also *id.* § 654 (guideline amounts must be "based on the concept that children should receive the same proportion of parental income after separation or divorce of their parents as they would receive if their parents were living together in one household"). The second purpose was to standardize child support awards to provide equitable treatment to parties in similarly situated cases by narrowing or eliminating judicial discretion. See Williams, *Guidelines for Setting Levels of Child Support Orders*, 21 Fam. L. Q. 281, 282 (1987). The third is to increase the efficiency of child support adjudication and increase settlements because of the better predictability of award amounts. See *id.* at 286.

In Vermont, the guideline amounts are established by rule of the Secretary of Human Services. See 15 V.S.A. § 654; Dep't of Social Welfare, Agency of Human Services, *Child Support Guidelines Handbook* (1987). Under the guideline regulations, a basic support amount for the children is derived from tables based solely on the total gross income of the parents and the number of children. See 15 V.S.A. § 653(1) ("Basic support obligation" defined as guideline amount unless court finds that amount inequitable and establishes a different amount). The next step is to calculate a "total support obligation" by adding expenditures in two categories to the basic support amount: (1) the amount of child care costs reasonably incurred by a parent as a result of employment or employment related education, *id.* § 653(2), (9); and (2) extraordinary medical or education expenses, *id.* § 653(4), (9). Once the total support obligation is calculated, the amount is divided between the parents "in proportion to their respective gross incomes." *Id.* § 656(a). In this calculation, as well as in the derivation of the basic support amount from the tables, a broad definition of gross income is used. See *id.* § 653(5). There are, however, three exclusions from income in reaching the "gross incomes" recognized by the statute: (1) the amount of "preexisting spousal maintenance or child support obligations actually paid," *id.* § 653(5)(E)(i); (2) amounts received from means tested public assistance programs, *id.* § 653(5)(E)(ii); and (3) the actual cost of providing adequate health insurance coverage for the involved children, *id.* § 653(5)(E)(iii).

Except as set forth above, the actual expenditures of the parents are not relevant to the guideline calculation. Thus, the guideline calculation for a noncustodial parent with a large mortgage payment would be the same as for a noncustodial parent with a low rent payment as long as both have the same income.

The total support obligation calculated under the guideline is "presumed to be the amount of child support needed," upon which the noncustodial parent's obligation is calculated. *Id.* § 655. However, if the court finds that a child support order based on the guidelines "would be inequitable," the court may

establish support after considering all relevant factors. *Id.* § 659(a). The statute contains a noninclusive list of factors to be considered. *Id.* § 659(a)(1)–(8).

## I.

The first question we face is whether the trial court can find an order based on the guidelines "inequitable" because of the expenses of supporting another child when the support obligation for that other child did not preexist the one for the child or children included in the guideline calculation. We believe that the trial court has this power.

We start with the wording chosen by the Legislature to describe when the court should deviate from the guidelines. The term "equitable" normally means "[j]ust; conformable to the principles of justice and right." Black's Law Dictionary 482 (5th ed. 1979). Thus, the use of the term "inequitable" must give the trial court authority to look at whether a guideline-based amount is just under the circumstances. We have held that the Legislature gave trial courts broad discretion when it required an "equitable distribution" of marital property. See 15 V.S.A. § 751(a). For example, in *Victor v. Victor*, 142 Vt. 126, 130, 453 A.2d 1115, 1117 (1982), we noted that distribution of property is a "matter of broad discretion for the trial court" and that there is no "precise mathematical formula; all that is required is that such distribution be equitable." Consistent with the use of the term "inequitable" in § 659, other language in the statute refers to a presumption that the guideline amounts will be used. See 15 V.S.A. § 655; see also Williams, *Guidelines for Setting Levels of Child Support Orders*, 21 Fam. L. Q. at 313 (Vermont statutes create a "rebuttable presumption" of use of the guidelines).[2] Such a characterization is consistent with the concept of a guideline as a guide to appropriate action rather than a precise mandate.

---

[2] The Family Support Act of 1988, which was adopted by Congress in 1988 and became effective in pertinent part October 13, 1989, requires that state support laws create a "rebuttable presumption" that guideline amounts are correct. The presumption can be rebutted by a showing that the guideline amount "would be unjust or inappropriate in a particular case." 42 U.S.C. § 667(b)(2).

■ While the wording chosen by the Legislature makes clear that it intended to give trial courts discretion to ensure support awards are just, this is an area where we must be careful to define the nature and scope of that discretion so that it is not used to create inequity or to undermine the standardization that the Legislature intended. Cf. *Klein v. Klein*, 150 Vt. 466, 473, 555 A.2d 382, 386 (1988). If we allow the trial courts to consider any variation in the needs of the children or the living situation or expenses of the parents, we would return to the preguideline law where a wide range of support amounts was permissible in almost every case. In short, the "escape valve" of § 659 would eat up the rule and destroy the predictability of amounts and the maintenance of the standard of living of the children that are the desired results of a guideline system.

Our examination of the statutory scheme demonstrates, however, that this case involves the type of situation where the Legislature intended that the court exercise discretion consistent with the policies of the act. That intent is demonstrated by the exclusion from gross income of certain support payments. See 15 V.S.A. § 653(5)(E)(i). While the drafting is not a model of clarity, we conclude that the exclusion covers amounts being paid pursuant to preexisting support orders. See *People in Interest of C.D.*, 767 P.2d 809, 811 (Colo. Ct. App. 1988) (interprets nearly identical language in Colo. Rev. Stat. Ann. § 14-10-115(10)(a)(II)); see also Elrod, *Kansas Child Support Guidelines: An Elusive Search for Fairness in Support Orders*, 27 Washburn L. J. 104, 130 (1987) (describes the nearly identical language in the Kansas guidelines as allowing a deduction "for child support payments under an existing order").

It is important to analyze what is covered by the exclusion and what is not. First, as we construe the legislative intent, it requires that there be an actual support order. Second, it requires that the order, not merely the obligation, be preexisting at the time the calculation is made. Third, it requires that payments be made on the order.

The limits of the second requirement are particularly important. It shows that the Legislature was primarily concerned about the timing of the orders. If a noncustodial parent is sub-

ject to two child support orders, the amount paid under the first order is always deductible under § 653(5)(E)(i) from that parent's income in determining the amount of the second order, even though the child covered by the second order might have been born before the child covered by the first order.

There are practical reasons why the Legislature created a rule allowing a parent to deduct the expenses of other support obligations only in limited circumstances. They are explained in *People in Interest of C.D.*, 767 P.2d at 811–12, in describing the identical Colorado rule:

> Inherent in the statutory scheme is a legislative recognition that child support obligations which have been previously imposed by a court have been determined to be both necessary and reasonable in amount in proper judicial proceedings. Non-ordered support obligations, on the other hand, have not been judicially scrutinized either as to their necessity or their reasonableness, and the General Assembly accordingly has not provided for automatic income adjustments based upon those obligations, whether or not they are actually paid.
>
> In addition, jurisdictional and practical impediments render the support schedule an ill-suited device to determine the necessity for, and the reasonableness of, support obligations for persons who are not parties to the proceedings before the court. . . . [T]he mere fact that a parent may have some legal duty to support other children does not indicate the extent of the support needs of the other children, . . . whether those needs are or can be met by other persons . . . [or] an obligor's actual contribution to those needs. The use of the statutory schedule under these circumstances requires the court to make assumptions concerning these matters which may not be wholly warranted.

These reasons involve practical considerations—a formula-guideline system using mathematical calculations may consider only specific, liquidated amounts that are paid periodically.

It would be unfair, however, to consider amounts paid under existing support obligations only when they are the subject of court orders. By allowing consideration of payments made to

discharge support obligations in instances where they have been scrutinized by a court and can be fit within mathematical formulas and allowing courts to deviate from support amounts calculated under the guidelines when such amounts are "inequitable," the Legislature must have intended that the courts use their discretion to consider the expenses connected with second families. The use of discretion in this area prevents the guideline system from being wholly arbitrary.

In reaching the conclusion that the court could consider the expenses of supporting other families under § 659, we also rely on the fact that the courts in Colorado, the state with a guideline system closest to that adopted in Vermont,[3] have reached the same conclusion. The Colorado courts have held that support obligations to other dependents may be evaluated in determining the extent to which a deviation from the guidelines is necessary to avoid an "inequitable" support order. See *People in Interest of C.D.*, 767 P.2d at 811; *In re Marriage of Rosser*, 767 P.2d 807 (Colo. Ct. App. 1988). In *Rosser*, the court reversed a trial court order that failed to take into account the fact that the noncustodial parent was living in New York City and was supporting another child. 767 P.2d at 809 ("the trial court abused its discretion in not deviating from the unjust result achieved by application of guideline calculations"). In *C.D.*, the court analyzed the difference between support obligations liquidated and reduced to orders and those not so liquidated. It found that the Legislature required automatic consideration of liquidated support orders because they have been found to be "necessary and reasonable in amount in proper judicial proceedings." 767 P.2d at 811. Support for dependents without an order does not have a judicial evaluation and, therefore, the noncustodial parent must prove amounts paid are "reasonable and necessary" under the circumstances. See also *In re Pater-*

---

[3] Colorado and Vermont use an income-share approach to setting guidelines. See Williams, *Guidelines for Setting Levels of Child Support Orders*, 21 Fam. L. Q. at 291. As noted earlier, Colorado has adopted an exclusion from income for the amount of preexisting child support obligations actually paid. Colorado also allows a deviation from the guidelines where their application would be inequitable. See Colo. Rev. Stat. Ann. § 14-10-115(3)(a).

*nity of B.W.S.*, 131 Wis. 2d 301, 319–20, 388 N.W.2d 615, 623 (1986) (fundamentally unreasonable to determine father's support obligation under percentage-of-income standards used in Wisconsin where there are "children in several households").

■ For the above reasons, we answer the first question in this case in the affirmative. The trial court may, under § 659, find that calculating a support order based on the guidelines would be inequitable because of a parent's expenses in supporting other dependents.

## II.

The second question is whether the court's discretion under § 659 extends to situations where the expenses are for the support of a second wife and a stepchild. The trial court found that Vermont law does not create a general obligation for stepparents to support stepchildren, but went forward to consider the expenses connected with supporting the stepchild in exercising its discretion under § 659.

■ The trial court found no obligation of support in this case because the statutory support obligation of stepparents is limited to situations where the financial resources of the natural parents are inadequate to provide the child with a reasonable subsistence. See 15 V.S.A. § 296; see also *id.* § 201 (definition of child includes stepchild for purposes of Uniform Desertion and Nonsupport Act); § 293 (obligation of stepparent when living separately from minor children). Although the stepparent support statute, 15 V.S.A. § 296, contains the language cited, it also states that the duty it imposes is "coextensive" with the duty to support a natural child. Therefore, we disagree with the trial court and find that the statute creates a general obligation of support. See *Archibald v. Whaland*, 555 F.2d 1061, 1065 (1st Cir. 1977) (similar New Hampshire statute that limits stepparent's obligation to situation where child is "in need" creates obligation of support of general applicability).

Neither the trial court nor the parties have raised any question about the defendant's obligation to support his second wife. The general obligation to support spouses extends to defendant's second spouse. See 15 V.S.A. § 291.

## III.

Having decided that the trial court could find the application of the guidelines to be inequitable in this case, we must address whether the court properly exercised its discretion in setting a support amount. We emphasize here that the fact that the court finds the application of guidelines to be "inequitable" in a particular case does not mean that it must automatically order a substantially lower support amount. As we have held in the case of a finding of changed circumstances to allow modification of a support order, "this conclusion opens the inquiry rather than closing it." *McCormick v. McCormick*, 150 Vt. 431, 437, 553 A.2d 1098, 1102 (1988). The use of § 659 means only that the special circumstances of the case make it inappropriate to determine a support amount based *solely* on the mathematical calculations involved in the guidelines. Instead, the court must consider all "relevant factors," including eight specific ones itemized in the statute. See 15 V.S.A. § 659(a)(1)–(8). It may be that an evaluation of these factors will lead to a support award as high as that calculated under the guidelines.

It is particularly important to emphasize that consideration of a case under § 659 does not necessarily mean a lower support amount in second-family cases. We have held that a change in financial circumstances "resulting from a deliberate and voluntary act, absent a sufficient reason for the sacrificing of income," will not support a modification of a child support order. *Jacobs v. Jacobs*, 144 Vt. 124, 127, 473 A.2d 1165, 1167 (1984); see also *Garrow v. Garrow*, 150 Vt. 426, 429, 553 A.2d 569, 571 (1988) (voluntary reduction of income not a change in circumstances). We recently applied this principle in a case in which the noncustodial parent remarried and had three children of the second marriage. See *Isham v. Isham*, 152 Vt. 637, 640, 568 A.2d 421, 423 (1989). We held that it was within the discretion of the trial court to deny a modification of defendant's support obligation to a child of his first marriage since the court could find that he had voluntarily reduced his income available for child support. See *id.* at 640, 568 A.2d at 423.

The voluntary nature of second-family obligations is not the only consideration in establishing the child support order

under § 659. The statute lists eight factors the court must consider. 15 V.S.A. § 659(a)(1)–(8). We agree with the trial court in this case that the financial resources of the new spouse of the parent is also a relevant consideration. A parent should not be able to rely on second-family expenses without consideration of second-family income and resources.

We have held with respect to the custody statute, when the Legislature itemized certain factors to be considered in determining parental rights and responsibilities, that the court's findings must show that it took each of the statutory factors into consideration. See *Harris v. Harris*, 149 Vt. 410, 414, 546 A.2d 208, 212 (1988). Other courts have held that when the trial court deviates from the use of guidelines, it must make findings to specify the reasons for the deviation. See, e.g., *In re Marriage of Marshall*, 781 P.2d 177, 180 (Colo. Ct. App. 1989). This holding is consistent with our rule that the trial court must clearly specify the basis for its support decision so we are not left to speculate on the rationale. See *Towne v. Towne*, 150 Vt. 286, 289, 552 A.2d 404, 406 (1988). We adopt the view, as with custody decisions, that the trial court's findings and conclusions must show it considered the factors specified in § 659(a) as well as other relevant factors and must show the reasons for the deviation from the guidelines and the amount of support ordered.

The findings and conclusions here are incomplete and much too sketchy to meet the above requirements. The court had evidence from both parties on their income and expenses. The evidence from the defendant showed a high level of consumer debt connected with the purchase of a house and furnishings for his new family. Although the court found that defendant's new spouse had "financial resources as represented by her education and former work experience," it apparently considered her to have no potential income when it set the support amount. In any event, the court never specified how, based on the evidence and its findings, it arrived at the figure of $90 per week as the new child support amount. Nor can we conclude that the court considered all the factors specified in § 659(a)(1)–(8) and considered the extent to which the defendant's expenses were volun-

tarily incurred in the face of his obligation to the children of his first marriage.

■ Because the findings and conclusions do not specify the reasons for the amount of support awarded and show consideration of the statutory factors, we must reverse and remand for a new hearing.

*Reversed and remanded.*

**Morse, J.,** dissenting. Because I believe the Court misconstrues the child support guidelines law, I respectfully dissent.

Under 15 V.S.A. § 659(a), the trial court may exercise discretion in establishing child support only if it "finds that a child support order based on the support guidelines would be inequitable." This determination of inequitability is a prerequisite to the court's exercise of discretion in setting an amount more or less than the guideline figure.

The legislature did not define what it meant by "inequitable." Nonetheless, a reading of the statute as a whole sheds light on the legislature's intent on this critical issue. As is well established in our law, the primary objective in interpreting a statute is to give effect to the intent of the legislature. *State v. Yudichak*, 147 Vt. 418, 420, 519 A.2d 1150, 1151 (1986). If doubt exists as to the plain meaning of statutory terms,

> or if the statute is ambiguous, the legislative intent "should be gathered from 'a consideration of the whole and every part of the statute, the subject matter, the effects and consequences, and the reason and spirit of the law.'"

*Paquette v. Paquette*, 146 Vt. 83, 86, 499 A.2d 23, 26 (1985) (citations omitted).

In adopting the new child support statute, the legislature stated its purpose as follows:

> The legislature . . . finds and declares as public policy that parents have the responsibility to provide child support and that child support orders should reflect the true costs of raising children and approximate insofar as possible *the standard of living the child would have enjoyed had the marriage not been dissolved.*

15 V.S.A. § 650 (emphasis added). That policy is reiterated in § 654 of the legislation:

> The rule shall be based on the concept that children should receive the same proportion of parental income after separation or divorce of their parents as they would receive if their parents were living together in one household.

The priority is clear. Children come first. Their living standard should not drop "insofar as possible."

To accomplish this overriding purpose, the Secretary of Human Services is charged to "prescribe by rule a guideline for child support which reflects the percent of combined gross income which parents living in the same household in Vermont *ordinarily* spend on their children." 15 V.S.A. § 654 (emphasis added). That amount shall then be "divided between the parents in proportion to their respective gross incomes." § 656(a). "The noncustodial parent shall be ordered to pay, in money, his or her share of the total support obligation to the custodial parent." *Id.* Because this figure is derived from what Vermont parents ordinarily spend on their children, it necessarily reflects their other ordinary expenses. The guideline thus already takes into account expenses such as home mortgage payments and purchases of common consumer goods. These expenses, therefore, do not justify a departure from the guidelines. By relying on them for just that purpose, the trial court—and this Court today—contravened, in my view, the core purpose of the legislation, to protect the children of a divorced family by assuring that their standard of living does not plummet. This priority is given lip service today by the Court, but that's all.

Defendant concedes on appeal that his "expenses were all related to a purchase of a home and furnishings for that home." Notably, defendant has not alleged the existence of any involuntary expenses such as unexpected medical costs, nor has he alleged an involuntary reduction in disposable income, such as would arise from being laid off. In fact, his gross income from his primary job had increased about forty-five percent since the divorce decree, from $18,000 to $26,000 per year. (In addition, he earned $2,000 a year from a part-time job.) His claim that a guideline-based order would be inequitable is based solely on

voluntary undertakings, expenses common for one in his circumstances. Cf. *Garrow v. Garrow*, 150 Vt. 426, 428–29, 553 A.2d 569, 571 (1988) (voluntary reduction of income not grounds for reducing support order). These expenses include payments on his $37,700 home mortgage as well as considerable short-term consumer debt on his four credit cards.

Defendant's brief purports to compare the parties' financial situations, alleging that plaintiff currently has a monthly disposable income of $8 while defendant suffers a shortfall of $642. This alleged discrepancy is not determinative of the issue. The courts should not further burden a custodial parent for living frugally in order to provide for her children in need and reward the noncustodial parent who, despite a higher gross income, has gone into debt. The legislature has determined that his children come first, before the obligations of his new home and furnishings; he must share, in the same proportion as his gross income compares to plaintiff's, in the cost of their upbringing.

While I agree with most of what is said in the Court's opinion, I do not construe § 659, which permits deviations from the guidelines "[i]f the court finds that a child support order based on the support guidelines would be inequitable," to allow a deviation on this record. The Court's holding today will lead to irrational results, rendering the child support law less effective and fair; indeed, it undermines the explicit purpose of the legislation. If defendant's new house and furnishings came before his children, he would *not* be honoring his "responsibility to provide child support [where] child support orders should reflect the true costs of raising children," § 650, and the children's needs would *not* be met by "the parents in proportion to their respective gross incomes," § 656.

In light of the legislation as a whole and its evident purpose, § 659 must be given a more narrow reading. The trial court's discretion to deviate from the legislative scheme is constrained. The determination of inequitability cannot be supported by the sorts of facts already considered in arriving at the support guideline figure. As stated above, that figure depends on what parents "ordinarily spend on their children," an amount that necessarily reflects their other ordinary expenses. The legisla-

ture therefore did not intend that ordinary expenses incurred by the noncustodial parent could support a finding that a guideline-based order would be inequitable. Only *extraordinary* expenses can justify a departure from the guidelines. This record reveals no extraordinary expenses. What they might be should be left to subsequent cases.

Whether or not defendant has a duty to support his stepson pursuant to 15 V.S.A. § 296, such a duty should not dilute his duty to pay child support to his natural children under 15 V.S.A. § 656(a). As I have emphasized, the guideline figure is based on the parties' gross incomes. "Gross income" is defined to include "income from any source." 15 V.S.A. § 653(5)(A). There is no exemption for income that a parent spends on a stepchild, unless that amount constitutes "preexisting . . . child support obligations actually paid." § 653(5)(E)(i). Here, of course, any amount defendant is obligated to pay his stepson does not constitute a *preexisting* support obligation. Indeed, his duty to his natural children is the preexisting obligation vis-a-vis his stepchild.

I am not of the view that defendant has no obligation to support his stepson. I would hold only that any such obligation must not be subtracted from his gross income in calculating the guideline child support figure. In this sense defendant's obligation to his stepchild is no different than his obligation to pay taxes. He may have a legal duty to pay both, but neither enters into the calculation of his child support obligation under the statutory guidelines.

It may be useful to compare the situation of a parent who is subject to a child support order stemming from a *former* marriage. In such a case, the earlier child support obligations, if actually paid, may reduce the parent's obligations to the children of the second marriage under the new statutory framework. See 15 V.S.A. § 653(5)(E)(i). Children of the second marriage receive diminished support relative to children of the first marriage. The legislature had to choose where to place the inevitable hardship—all things being equal—resulting from the assumption of second-family responsibilities. It chose to keep child support, as dictated by the guidelines in the usual case,

intact for children who were already the beneficiaries of a child support order. This is as it should be. The decision to assume added familial responsibilities should include an evaluation of the added cost, without factoring in a reduction in support to children of the divorce to help finance the second family. In short, the Court's decision today reduces the cost equation at the expense of children of divorce.

I would not fashion a per se rule. Expenses for children in a second family in some instances might well warrant a departure from the guidelines. It is not necessary to broaden discretion under § 659(a)'s inequitability standard, however, to, in the words of the Court, "prevent[ ] the guideline system from being wholly arbitrary." This case involves expenses related to defendant's stepchild and second wife which were neither onerous nor extraordinary. The trial court found that the stepson's mother—a college graduate, a violinist, and experienced as a secretary with administrative skills, who wished to be with her family rather than work the six months prior to the hearing—has "financial resources as represented by her education and her former work experience." We cannot ignore this finding unless it is clearly erroneous, V.R.C.P. 52, and no one argues that it is clearly erroneous. Moreover, as defendant concedes in his brief, "Mr. Ainsworth's expenses were all related to a purchase of a home and furnishings for that home." It is on these facts that I would conclude that the trial court's determination of inequitability under § 659(a) was not permitted.

Defendant emphasizes that the motion for modification was brought less than eighteen months after the original divorce decree. There may indeed be some "unfairness" to the noncustodial spouse inherent in these circumstances. He may not have expected a sudden increase in child support obligations, and he may have planned his life accordingly. But the legislature made a deliberate policy choice to prefer this "unfairness" over the unfairness both to children whose living standards would drop without sufficient support and to custodial parents bearing more than their fair share of the cost of raising their children. Besides, while defendant may not have expected the law on child support to change as it did, the law did not "strike out of

the blue." The law was enacted on May 13, 1986, to go into effect on April 1, 1987. The purpose for the delay was to allow the Secretary of Human Services to prepare the guidelines, 15 V.S.A. § 654, and, perhaps, to give notice to those who may be caught in a transition from the old way of deciding child support issues. Thus, defendant was on notice that he might have to pay more support if what he agreed to pay in 1986 varied more than fifteen percent from what the guidelines showed when promulgated in 1987. Moreover, the guidelines had been in effect nearly five months when defendant remarried and purchased a house.

Under today's ruling, determination of child support is subject in large measure to the vagaries of individual judgment as to what is fair, given all the facts and circumstances of each case. The guidelines, however, are designed to give child support determinations a measure of predictability and equality and to reduce litigation. They are intended to ensure that like cases will be treated alike by judges who do not think alike in this area of subjective value judgments. If the guidelines are circumvented under the "equitable" rubric of § 659(a), we will return to the inequities, waste and drain of preguideline litigation. Exceptions to the guidelines should not be based on a judge's opinion of the fairness of the guidelines per se or upon voluntary undertakings by a party to establish and support a second family with funds that would otherwise go to support existing children. This policy may not appear romantic, but it reflects the pragmatic belief that new obligations should not be created or assumed at the expense of existing ones.

Accordingly, I would reverse and remand for an order setting child support at $141 per week.